1
2
3
4
5

**HODL LAW CALI, APC**
**Frederick A. Rispoli, Cal. Bar No. 321794**
**27762 Antonio Parkway**
**Suite L-1 No. 232**
**Ladera Ranch, CA 92694**
**Telephone: (213) 292-5200**
Filing@HodlLaw.org
*Attorney for Plaintiff*

6
7
8
9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22

| | |
|---|---|
| DALLAS WOODY, on behalf of himself and all others similarly situation<br><br>*Plaintiffs*,<br><br>vs.<br><br>COINBASE GLOBAL, INC.; COINBASE, INC.; BRIAN ARMSTRONG; JOHN DOES or JANE DOES 1 through 200; and BLACK AND WHITE CORPORATIONS 1 through 50<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT**<br>**CLASS ACTION**<br>**DEMAND FOR JURY TRIAL**<br><br>Civil:<br><br>1) Breach of Fiduciary Duty;<br>2) Fraud – Intentional Misrepresentation;<br>3) Negligent Misrepresentation;<br>4) Constructive Fraud;<br>5) Conversion;<br>6) Common Count – Money Had and Received; and<br>7) Negligence<br>8) Violation of Unfair Competition Law<br>9) Request for Declaratory Relief |

23
24
25
26
27
28

   Plaintiff Dallas Woody, individually and on behalf of all others similarly situated, allege the following against Defendants Coinbase Global, Inc. ("Coinbase Global"), Coinbase, Inc. (collectively referred to as "Coinbase"), and Brian Armstrong (collectively, "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief. Plaintiff believes substantial evidentiary support will exist for and further support the allegations set forth herein after a reasonable opportunity for discovery.

Complaint                                    1

## INTRODUCTION

1.      Coinbase is an American company that created and operates a website from which customers can buy and sell digital assets or digital currency units ("DCUs"), which also are commonly referred to as cryptocurrencies. During the period between February 28, 2019, and December 12, 2020 (the "Class Period"), Coinbase has used its platforms to buy and sell digital assets to its customers and specifically listed a DCU called XRP.

2.      In the context of digital assets, "airdrops" occur when a particular digital asset project decides to deposit the project's newly created digital asset into the digital wallets of existing DCU owners. One of the purposes behind airdrops is that new projects can build a larger network of users in a quicker manner.

3.      Beginning February 28, 2019, Coinbase permitted the buying, selling and custody of one of the most useful and popular DCUs on a global scale, XRP. The XRP digital currency unit is native to the XRP Ledger ("XRPL") Network, a blockchain network that—for general comparison only—is similar to the Bitcoin and Ethereum blockchain networks.

4.      Because of this popularity and utility, certain digital asset projects sought to airdrop their newly created tokens to XRP owners, like Plaintiff.

5.      Flare Network is a business entity that operates in the blockchain industry.

6.      Flare Network is a blockchain company that created the Flare DCU ("FLR"). Flare Network decided to airdrop FLR to XRP owners via a "snapshot" of participating XRP digital wallets (herein referred to as the "Flare Airdrop"). The snapshot occurred on December 12, 2020 (herein referred to as the "Snapshot").

7.      Defendants affirmatively promised they would participate in the Flare Airdrop on behalf of all its customers holding XRP on their platforms.

8.      Defendants' repeated and public affirmations of participation in the Flare Airdrop on behalf of its customers additionally induced Plaintiff to: (1) purchase XRP from Defendants; (2) keep his XRP currency in Defendants' custody; and/or (3) transfer his XRP currency from other wallets to Defendants' custody.

9.      As part of the airdrop, Flare Network distributed Songbird DCUs ("SGB") in September 2021 as a precursor to distribution of the FLR. Flare Network distributed FLR to Defendants on January 9, 2023.

10.     Unlike the largest digital asset exchanges that likewise participated in the Flare Airdrop and lawfully distributed SGB and FLR to its users (such as cryptocurrency exchanges Uphold and Kraken), Coinbase refuses to distribute Plaintiff's SGB and FLR tokens, despite having received them from Flare Network at the time of the SGB and FLR distributions. In so doing, Defendants have unjustly converted the property of Plaintiff in addition to breaching California's Unfair Competition Law and committing several other tortious acts as set forth below.

11.     Based on Defendants' unlawful actions with respect to SGB and FLR, Plaintiff individually and on behalf of the proposed class of all Coinbase customers with accounts holding XRP, Plaintiff seeks declaratory relief that he is the owner of SGB and FLR currently held by Coinbase on his behalf and damages related to losses incurred through Defendants' unlawful conversion of Plaintiff's SGB and FLR.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1). There is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of costs and interest.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceeds $5 Million, exclusive of interest and costs, and Plaintiff and most members of the proposed Class are citizens of a state different from Defendants.

14.     The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their tortious acts throughout the United States, including this District. The scheme has been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including this District.

## DIVISION ASSIGNMENT

15.     The claims in this matter are district-wide and a substantial part of the events or omissions giving rise to the claims at issued occurred in San Francisco County, making division assignment appropriate for either the San Francisco or Oakland Divisions.

//
//
//

**VENUE**

16.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965 because some of the actions giving rise to this Complaint took place in this District, particularly the actions of Defendants, who reside in the District.

**THE PARTIES**

17.     Plaintiff Class Representative Dallas Woody is a United States citizen and resident of Virginia. Mr. Woody had Coinbase accounts with XRP at the time of the Snapshot and was eligible for the Flare Airdrop.

18.     Defendant Coinbase Global, Inc. is a Delaware corporation.

19.     Defendant Coinbase, Inc. is a Delaware corporation that is a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase Global and Coinbase, Inc. are operated as one corporation, and users have no visibility into which entity they are transacting with. Although both companies have offices throughout the United States, Coinbase Global and Coinbase, Inc. conduct much of their business through their California headquarters, located at 430 California Street in San Francisco, California.

20.     Defendant Brian Armstrong is the founder of Coinbase and the CEO of both Coinbase Global and Coinbase. Upon information and belief, he is a citizen and resident of California and a resident of this District. He has been reported to own a nineteen percent stake in Coinbase.

21.     Because he is the founder and CEO of Coinbase, Defendant Armstrong had the power and authority to direct the management and activities of Coinbase and its employees, and to cause Coinbase to engage in the wrongful conduct complained of herein. At the time of the wrongs alleged herein, Defendant Armstrong had consistent and daily management of operations of Coinbase, including the decision to accept all SGB and FLR from the Flare Airdrop on behalf of his customers yet withhold that distribution from the lawful owners (his customers) of the SGB and FLR. Armstrong purposefully exercised his power and influence to cause Coinbase to engage in the wrongful conduct described in the causes of action identified below. At all relevant times, Armstrong knowingly and culpably participated in, and/or aided and abetted Coinbase's wrongful conduct described below.

22.     Accordingly, Defendant Armstrong is jointly and severally liable for the violations of Coinbase complained of herein and is liable to Plaintiff and the Class for damages as to all transactions in which Plaintiff and Class members purchased, transferred, and/or custodied XRP with Coinbase in reliance on his and his companies' promises to participate in the Flare Airdrop as well the losses Plaintiff and Class members suffered by being prevented from using and/or selling their SGB and FLR.

23.     Does 1 through 200 and Black and White Corporations 1 through 50 are persons and/or entities whose relationships to the named Defendants, or whose acts or omissions give rise to legal responsibility for the damages incurred by Plaintiff and Class members, but whose true identities, at the present time, are unknown to Plaintiff. These persons are hereby notified of Plaintiff's intention to join them as defendants if and when additional investigation or discovery reveals the appropriateness of such joinder.

## SUBSTANTIVE ALLEGATIONS

## I.     DIGITAL ASSETS, DIGITAL EXCHANGES, AND AIRDROPS.

### A.     Blockchain Technology And Its Origins.

24.     This case concerns cryptocurrencies.[1] Cryptocurrencies are digital assets that employ cryptographic mechanisms to secure transactions, control the creation of additional unites, and verify transactions. The underlying framework that permits this process to function is the "blockchain."

25.     Before blockchain technology, the primary obstacle preventing the creation of cryptocurrencies was the "double-spend" problem. Previously, digital files were transmitted by duplication of the file itself. If one were to email or text a photo to another, the transaction resulted in the photo being duplicated—the sender and recipient both had an exact copy. This problem stopped the ability of a digital asset to have value as there was no mechanism to prevent infinite duplication.

26.     The creation of the blockchain solved this problem in an elegant manner. The blockchain is a digital ledger that tracks the ownership and transactional history of its native cryptocurrency. The first blockchain termed its native cryptocurrency Bitcoin. The Bitcoin blockchain (aka Bitcoin Network) thus tracks every transaction of every Bitcoin in existence. Every Bitcoin owner receives a digital address in order to take ownership of Bitcoin. The Bitcoin blockchain publicly lists every digital address and the amount of Bitcoin tied to that address. Digital addresses are commonly referred to as "digital wallets." Every transaction from every address is publicly available and, for practical purposes, immutable.

27.     Consequently, because of its openness and immutability, the Bitcoin Network provides a secure transaction mechanism to exchange value among parties. Transactions cannot be counterfeited or otherwise reversed.

---

[1] "Cryptocurrency" is the common term used in the popular culture to refer broadly to digital assets, which are "tokens" created on the blockchain and are a fundamental component that permits the blockchain to function. Cryptocurrencies, digital assets, crypto-assets, and DCUs are all different ways to refer to the same token-blockchain concept described herein.

28.     While the Bitcoin Network pioneered blockchain technology, numerous other blockchains have been created since Bitcoin. Nearly every blockchain utilizes a cryptocurrency, digital asset, DCU, *etc.* and many such assets have also been created on top of existing blockchains. The properties, variability and capabilities of blockchains are dependent on the software coding of each one. Unlike the Bitcoin Network, some blockchains allow the reversal of transactions. Other blockchains use different consensus mechanisms to verify transactions.

29.     Ownership of cryptocurrencies is similar to the ownership structure of bearer bonds. Unlike a bearer bond where the presumed owner is whoever holds the physical paper on which the bond is issued, the owner of a cryptocurrency is whoever holds the cryptographic keys. These keys have two components, a public and private key. The public key is the digital address (aka wallet) that is publicly accessible and which the parties must know in order to execute a transaction. The private key is what permits the owner to access the public address and initiate or confirm a transaction.

**B.      The XRPL Network And Its Native Digital Currency Unit, XRP.**

30.     The XRPL Network was first launched in June 2012. The native token of the XRPL Network is the XRP DCU. At inception, the XRPL Network was programmed to operate with a total supply of one hundred billion XRP. As a reference, the Bitcoin Network was programmed to operate with a total supply of twenty-one million Bitcoin.

31.     Because the transaction speed of the XRPL Network is orders of magnitude greater than other popular networks like Bitcoin and Ethereum, one popular (but by no means exclusive) use case for XRP is in the context of cross-border transactions.

32.     Since the creation of XRP and the XRPL Network, XRP has been sold, "burned" or otherwise transferred by countless individuals and entities, including third-parties such as individuals and digital asset exchanges on the secondary market.

33.     Coinbase is a digital asset exchange that sells DCUs that exist on various blockchain networks. Before permitting its users to purchase any particular cryptocurrency, Coinbase has publicly stated that it engages in an extensive review to determine whether it is appropriate to list a particular DCU on its exchange. One component of that review is determining whether a DCU could be considered a security that would implicate U.S. securities laws. Because Coinbase is not registered with the U.S. Securities and Exchange Commission ("SEC") as a securities broker, it does not list cryptocurrencies it evaluates as having the attributes of a security.

34.     After an extensive review in which Coinbase determined XRP was not a security and received a "no-response" from the SEC when it queried the SEC for its official opinion, Coinbase listed XRP for trading on its exchange on February 28, 2019. Coinbase also allowed its users to transfer XRP from other digital wallets to Coinbase's wallets.

35.     Coinbase suspended trading of XRP on January 19, 2021, but continued to allow its users to deposit and withdraw XRP at users' discretion.

**C.      Coinbase Is A Centralized Digital Asset Exchange.**

36.     In order to foster a market for users to transact in cryptocurrencies, digital asset exchanges were borne to serve as a location for users to connect and transfer their digital assets, very similar to commodities exchanges. Today, there are mainly two types of digital asset exchanges, those that are centralized and those that are decentralized.

37.     Coinbase is a centralized digital asset exchange. If a person or entity wants to trade digital assets on Coinbase, the company requires the person or entity to create an account with Coinbase. Although Coinbase customers are permitted to transfer cryptocurrencies off its platform to their own digital addresses, customers primarily have Coinbase custody their cryptocurrencies on the company's own digital wallet addresses. As a result, when customers transact in digital assets on Coinbase's exchange, Coinbase is not transferring assets between its customers. Rather, the digital assets themselves remain in Coinbase's custody on its own digital wallet addresses and its internal accounts simply debit or add the digital asset to the customers' Coinbase account.

38.     Decentralized exchanges are platforms that connect cryptocurrency users and allow them to directly transact with each other. Unlike Coinbase, where customer transactions result in changes to the customers' accounts, not actual transfers of digital assets between digital assets, decentralized exchanges pair those who wish to trade a particular cryptocurrency and those participants actually transfer the assets over the blockchain—the transaction is recorded publicly and can be viewed.

**D.      Certain Blockchain Projects Distribute DCUs Via Airdrops.**

39.     Blockchain-based projects have the ability to build on top of existing blockchains by minting new digital assets that require the underlying blockchain to operate. The Ethereum blockchain network is the most popular blockchain upon which other projects create their own DCUs. Using this blockchain as an example, a startup project can airdrop its newly-created token into the digital wallets of pre-existing users of the Ethereum Network. For example, if a project is going to airdrop 30 units of its newly-created DCU on the Ethereum Network, individual public addresses simply receive 30 units of the new token.

Complaint                                              7

40.     Germane to the XRPL Network, assets other than XRP can likewise be represented on the XRPL Network as tokens. Types of tokens issued upon the XRPL vary widely and can include stablecoins backed by tangible assets, fiat digital tokens, and community credits. Any project wishing to issue tokens on the XRPL requires funded XRPL accounts and a certain amount of XRP.

41.     Other projects can create their own blockchains with the foundational principle that the new blockchain will be interoperable with other existing blockchains.

42.     Often, there is some type of participation mechanism that governs which entities will receive the new DCU in the airdrop. "Standard" airdrops occur where the startup project transfers a specific amount of its new DCU to participants interested in receiving the airdrop. Typically, standard airdrops have a set number of tokens to distribute with a limit on how many tokens each individual may receive. "Holder" airdrops occur automatically based on who is holding existing tokens and how many tokens they hold. Oftentimes there is a time-sensitive component of airdrops that requires those interested in receiving airdropped DCUs to take a particular action by a particular time.

## II.     FLARE NETWORK CONDUCTED AN AIRDROP AND SNAPSHOT FOR XRP HOLDERS.

43.     According to its website, Flare Network is "a new blockchain which presents developers with a simple and coherent stack for decentralized interoperability." The project has an ambitious goal to connect everything-to-everything, allowing "developers to build applications that capture the largest possible addressable market, serving multiple communities and ecosystems simultaneously through a single development. By securely connecting blockchains and real world data, Flare creates a decentralized solution to scale Web3." Some of Flare Network's goals include the creation and implementation of scalable smart contracts and decentralized data feeds such as price feeds.

44.     Like any other blockchain project, Flare Network required the DCU component to make its project function. Flare Network named its DCU "Flare" and announced that it would utilize the XRP as one of the first blockchains upon which to base its mission of interoperability.

45.     Flare Network announced that it would airdrop FLR tokens to XRP holders based on each holders' amount of XRP via the Snapshot (i.e., participating wallets on the XRPL Network on December 12, 2020). In addition to participating individual wallets, Flare Network further announced it would airdrop FLR to those exchanges that affirmed participation in the Snapshot on behalf of those exchanges' customers.

46.   Flare Network announced a distribution ratio of approximately 0.15 SGB for each XRP. The initial distribution of FLR is in a ratio of 0.15 FLR for each XRP, although Flare Network has indicated it will distribute additional FLR over time.

47.   Defendants publicly affirmed Coinbase would participate in the Snapshot and provide XRP holders with the benefits of the Snapshot.[2]

48.   Defendants publicly affirmed that Coinbase would participate in the Flare Airdrop on behalf of all its Coinbase customers that were holding XRP in their accounts on the Snapshot.

49.   In order to fully participate, Defendants publicly affirmed that XRP transactions would be paused for fifteen minutes prior to the Snapshot and that no minimum XRP balance would be required.

50.   Defendants publicly told their customers that no action would be required from XRP holders as those customers would be automatically included in the Flare Airdrop.

51.   Upon information and belief, Coinbase and Armstrong entered into one or more written agreements to participate in the Flare Airdrop in exchange for tokens from Flare Network in addition to those designated to its customers holding XRP.

52.   In reality, and deliberately hidden from Plaintiff at the time, Defendants had no intention of distributing to its customers the SGB and FLR received from the Flare Airdrop.

53.   Plaintiff and members of the Class, simply as customers holding XRP in Coinbase accounts, were legally entitled to the distribution of their SGB and FLR within a reasonable time, which would be no later than a few days after the airdrop for SGB and FLR occurred.

54.   Alternatively, and in reliance on Defendants' stated participation in the Snapshot and Flare Airdrop, Plaintiff and members of the Class maintained XRP in their Coinbase accounts, transferred XRP into their Coinbase accounts, purchased XRP prior to the Snapshot in their Coinbase accounts, and/or created Coinbase accounts and purchased XRP prior to the Snapshot.

III.   **AS PART OF THE SNAPSHOT, FLARE NETWORK AIRDROPPED SGB AS A TEST NETWORK IN PREPARATION FOR THE FLR AIRDROP.**

55.   Prior to the launch of a blockchain project, some projects first create a test network, often called a "canary" network, to engage in real-time testing and eliminate coding errors. Importantly, the

---

[2] *See*, **Exhibit A**, Coinbase Website, "Flare Airdrop," Coinbase Help, *previously available at* https://help.coinbase.com/en/coinbase/trading-and-funding/cryptocurrency-trading-pairs/Flare but removed at an unknown date by Defendants.

canary network is simply a predecessor component of the finalized "main net" network—it is an operational blockchain with a token supply intended to test features of the forthcoming main net.

56.     Tokens created on the canary network have value because of the scarcity of the token supply, serving as an incentive for users (and even attackers) to utilize the canary network and hence provide valuable information in preparation for launch of the main net.

57.     As part of its extensive testing of its network (which would ultimately deploy the FLR), Flare Network announced that it had "reached a point with many elements where little more can be understood from further testing on an isolated network. We will now progress to live testing on an operational blockchain in an adversarial environment. In the next 6 weeks we will be releasing a 'Canary' network for Flare called Songbird."

58.     According to Flare Network: "Songbird is the Canary network for Flare, it will have two distinct phases. Prior to the launch of Flare, Songbird will be instrumental in the continued testing of the Flare Time Series Oracle, the StateConnector and F-Asset systems and the network architecture. The FTSO and F-Asset protocols will be live on Songbird with F-Assets generated from the underlying tokens. This will improve the security, stability and credibility for the ultimate launch of Flare. Post Flare launch, Songbird is intended to be a long term network for testing governance led changes to Flare, such as the incorporation of new F-Assets, changes to the FTSO, F-Asset systems or any other network change."

59.     Further according to Flare Network: "In all periods Songbird has two other core uses. First, advanced testing and community building for applications that wish to launch on Flare. Ideally all applications that launch on Flare, especially those that utilize the FTSO and F-Asset systems will test initially on Songbird. Second, as a way for FLR token holders to familiarize themselves with key Flare protocols such as delegation to the FTSO, minting of F-Assets and usage of applications that build on Flare without putting their FLR tokens at risk."

60.     Because of the testing using Songbird, "Flare will launch with all the tested core protocols, FTSO, initial F-Assets and StateConnector. The use of Songbird as the testbed for potential updates to Flare means that between Flare and Songbird, Songbird will often be the more advanced network. Innovations and new dApp launches will happen first on Songbird and then may be rolled out on Flare after testing. This makes Songbird its own type of network which may be useful, in isolation, to applications that do not need the intended stability of Flare, but which wish to enjoy the core Flare protocols and potentially more advanced features that Songbird may offer ahead of Flare. This might

generally appeal to lower value applications whereas Flare might appeal to applications handling greater amounts of value."

61.     The Songbird canary network utilized its native token, SGB. As Flare Network publicly stated, the distribution mechanism of SGB would be "in the same ratio to all the same recipients of the FLR distribution. Total starting supply will be 15 Billion with initial inflation of 10% per annum through the FTSO and validator rewards systems. **This means for every 1 XRP that was held at the time of snapshot 0.1511 SGB will be allocated."** (emphasis added).

62.     Supporting that its canary network was a critical first-step in the launch of its main net, Flare Network stated the main net "will launch after substantial testing of all systems on Songbird with the current final security audit scheduled to finish at [a later date]."

**IV.   DEFENDANTS RECEIVED THE AIRDROPPED SGB AND FLR RESERVED FOR ITS CUSTOMERS AND HAS REFUSED TO DISTRIBUTE THEM AS REQUIRED—AND PROMISED.**

63.     Importantly in the context of this case, Flare Network alerted the public that "If you claimed your FLR through an exchange they will receive SGB on your behalf. You will need to ask them to distribute it to you."

64.     Prior to the Snapshot, Defendants repeated on multiple occasions that they would participate in all aspects of the Snapshot and Flare Airdrop. At all relevant times, Defendants never publicly stated it would limit its participation or withdraw entirely from participation in the Flare Airdrop.

65.     In September 2021, Defendants received millions of the SGB slated for its customers.

66.     Since September 2021, despite receiving thousands of inquiries from its customers, Defendants have refused to provide their customers with their own SGB.

67.     On January 9, 2023, Defendants received millions of FLR slated for its customers.

68.     Since January 9, 2023, Defendants have refused to provide their customers with their own FLR and instead have chosen to issue a vague, ambiguous statement that Defendants may release its customers own FLR "sometime" between now and June 30, 2023.

69.     There is no physical, legal or technological impediment that prevents Defendants from near-instantaneous distribution of SGB and FLR to its customers.

70.     Most of Defendants' competitor exchanges, such as Uphold and Kraken, recognizing their legal obligations to their customers, have distributed SGB and FLR to their customers shortly after receiving SGB and FLR from Flare Network.

71.     On its September 2021 distribution, the value of SGB was approximately $0.32 per SGB. At the time of the filing of this action, its value had plummeted to approximately $0.01 per SGB. At its peak, SGB reached a value of $0.71 per SGB. Plaintiff and the Class members have therefore suffered a 98% loss in value due to Defendants' tortious acts—and continue to incur damages. Further, it is unknown—though will be determined during discovery—if Coinbase sold its customers SGB at the height of its market value.

72.     Similarly, and though only recently distributed to the market on January 9, 2023, the value of FLR on distribution was approximately $0.07 per FLR.  At the time of the filing of this action, its value has decreased to approximately $0.04 per FLR. Plaintiff and the Class members have therefore suffered an 18% loss in value due to Defendants' tortious acts—and continue to incur damages.

### CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

74.     Plaintiff seeks class certification on behalf of a class defined as follows:

> **NATIONWIDE CLASS**: All persons or entities who maintained customer accounts holding XRP with Defendants' exchange at the time of the Snapshot for the Flare Airdrop ("the Class Period").

75.     Plaintiff reserves the right to modify or refine the definition of the Class based upon discovery of new information and to accommodate any of the Court's manageability concerns.

76.     Excluded from the class are: (a) any judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assignees, subsidiaries, and any entity in which Defendants engaged in furtherance of their tortious interference, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for plaintiffs and defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

77.     **Ascertainability.**  The proposed class is readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a class. Further, the class can be readily identified through Defendants' and Flare Network's business records. Additionally, the XRPL Network itself is a public, immutable ledger that records all transactions ever occurring on it, making ascertainability significantly easier than a typical class action.

78.     **Numerosity (Rule 23(a)(1)).** The class is so numerous that joinder of individual members herein is impractical. The exact number of members of the class, as herein identified and described, is not known, but upon information and belief there are tens of thousands (if not hundreds of thousands) of XRP owners that maintained XRP accounts on Defendants' exchange at the time of the Snapshot.

79.     **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual class members, including the following:

- Whether Defendants affirmed to its customers, i.e., Plaintiff, that they would participate in the Flare Airdrop;

- Whether Defendants received its customers' SGB and FLR in accordance with the Flare Airdrop;

- Whether Defendants breached their fiduciary duties in keeping their customers' SGB and FLR for themselves instead of properly distributing them to their customers;

- Whether Defendants engaged in fraud, constructive fraud, intentional misrepresentation, negligent misrepresentation, and converstion by their promises to fully participate in the Flare Airdrop—and then refusing to fully participate;

- Whether Defendants violated California's Unfair Competition Law;

- Whether Plaintiff and the members of the class are entitled to damages and the amount in measure thereof; and

- Whether Plaintiff and members of the class are entitled to declaratory and injunctive relief.

80.     **Typicality (Rule 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the proposed class. Plaintiff and members of the class (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the class.

81.     **Adequacy (Rule 23(a)(4)).** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation in class actions. Plaintiff has no interest that is antagonistic to those of the Class, and defendants have no defense that is unique to plaintiffs. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and he has the resources to do

so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of other members of the Class.

82.  **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the class would impose heavy burdens upon the courts and Defendants, would create a risk of inconsistent or varying at adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

83.  Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting the individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

84.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because defendants acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

85.  Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

### By All Defendants

### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by reference all the allegations contained in this Complaint as if the same were fully set forth herein.

86.  As explained above, on several occasions leading up to the Snapshot, Defendants entered into a relationship wherein Plaintiff, as principal, reposed confidence and trust in the integrity of

Defendants, as agents and custodians, to hold in trust and manage Plaintiff's XRP in preparation for participation in the Snapshot.

87.    Defendants voluntarily accepted or assumed to accept this confidence.

88.    Defendants acted on Plaintiff's behalf for purposes of holding Plaintiff's XRP funds in trust, managing Plaintiff's XRP funds, and assisting and advising Plaintiff with respect to Defendants' participation in the Snapshot through Defendants' public statements.

89.    Defendants breached their fiduciary duties by failing to act as reasonably careful agents and trustees would have acted under the same or similar circumstances by withholding and/or converting Plaintiff's SGB and FLR for their own use and/or possession and thus acting contrary to their duty of loyalty to Plaintiff.

90.    Defendants' conduct in breach of their fiduciary duties was a substantial factor in causing Plaintiff's harm.

91.    As a direct, proximate, and foreseeable result of Defendants' breach of fiduciary duty, Plaintiff suffered and continues to suffer damages in an amount to be proven at trial.

92.    The aforementioned conduct of Defendants was oppressive, fraudulent, malicious, and willful, and was intended to cause injury to Plaintiff.  Therefore, Plaintiff is entitled to an award of exemplary or punitive damages to deter such conduct in the future.

## SECOND CAUSE OF ACTION

### Fraud – Intentional Misrepresentation

### By All Defendants

### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by reference all the allegations contained in this Complaint as if the same were fully set forth herein.

93.    Defendants knowingly made false representations to Plaintiff which are set forth in Paragraphs 7, 8, 10, 20, 47-54 and 64-72.

94.    These representations made by Defendants were in fact false.

95.    When Defendants made these representations, they knew them to be false and made them with the intention to deceive, defraud, and induce Plaintiff to act in reliance on the representations, with the expectation that Plaintiff would so act.

96.    Plaintiff, at the time these representations were made by Defendants, and at the time Plaintiff took the actions that he did, was ignorant of the falsity of the representations and reasonably

believed the representations of Defendants to be true.

97.     In reliance upon the representations of Defendants, Plaintiff was induced and did:

    a.     Enter into contract with Coinbase as a customer;

    b.     Maintain customer accounts with Coinbase that held XRP at the time of the Snapshot;

    c.     Forego Plaintiff's ability to custody and/or purchase XRP on another digital currency unit exchange that agreed to—and did—participate in the Flare Airdrop; and

    d.     Take the other actions described above based on Defendants' representations.

98.     Had Plaintiff known of the actual facts, that Defendants never intended to fully participate in the Flare Airdrop as they publicly advertised, Plaintiff would not have taken such actions.

99.     Plaintiff's reliance upon the representations of Defendants is justified because Defendants held themselves out as experienced and knowledgeable actors within the digital asset industry who were willing to act in good faith as Plaintiff's fiduciary. Plaintiff had no reason to believe that the representations of Defendants were false.  Moreover, as a result of their fiduciary relationship, Plaintiff had a right to rely on the representations made to him without a duty to inquire further.

100.    As a proximate result of the fraudulent conduct of Defendants, as alleged above, Plaintiff suffered damages in the nature and amounts set forth in Paragraphs 7, 8, 10, 20, 47-54, and 64-72, above.

101.    The aforementioned conduct of Defendants was oppressive, fraudulent, malicious, and willful, and was intended to cause injury to Plaintiff.  Therefore, Plaintiff is entitled to an award of exemplary or punitive damages to deter such conduct in the future.

**THIRD CAUSE OF ACTION**

**Negligent Misrepresentation**

**By All Defendants**

**On Behalf of Plaintiff and Class Members**

Plaintiffs hereby incorporate by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

102.    Defendants made representations to Plaintiffs which are set forth in Paragraphs 7, 8, 10, 20, 47-54 and 64-72.

103.    These representations made by Defendants were in fact false.

104.    These representations were made by Defendants negligently and without a reasonable basis for believing them to be true.

Complaint                                                        16

105.   When Defendants made these representations, they knew them to be false and made them with the intention to deceive, defraud, and induce Plaintiff to act in reliance on the representations, with the expectation that Plaintiff would so act.

106.   Plaintiff, at the time these representations were made by Defendants, and at the time Plaintiff took the actions that he did, was ignorant of the falsity of the representations and reasonably believed the representations of Defendants to be true.

107.   In reliance upon the representations of Defendants, Plaintiff was induced and did:

a.   Enter into contract with Coinbase as a customer;

b.   Maintain customer accounts with Coinbase that held XRP at the time of the Snapshot;

c.   Forego Plaintiff's ability to custody and/or purchase XRP on another digital currency unit exchange that agreed to—and did—participate in the Flare Airdrop; and

d.   Take the other actions described above based on Defendants' representations.

108.   Had Plaintiff known of the actual facts, that Defendants never intended to fully participate in the Flare Airdrop as they publicly advertised, Plaintiff would not have taken such actions.

109.   Plaintiff's reliance upon the representations of Defendants is justified because Defendants held themselves out as experienced and knowledgeable actors within the digital asset industry who were willing to act in good faith as Plaintiff's fiduciary. Plaintiff had no reason to believe that the representations of Defendants were false.  Moreover, as a result of their fiduciary relationship, Plaintiff had a right to rely on the representations made to him without a duty to inquire further.

110.   As a proximate result of the fraudulent conduct of Defendants, as alleged above, Plaintiff suffered damages in the nature and amounts set forth in Paragraphs 7, 8, 10, 20, 47-54, and 64-72, above.

## FOURTH CAUSE OF ACTION
### Constructive Fraud
### By All Defendants
### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

111.   Defendants and Plaintiff had a fiduciary relationship.

112.   Defendants breached the fiduciary arising from this relationship by mismanaging and

misappropriating Plaintiff's SGB and FLR.

113.    Defendants gained an advantage as a result of this breach.

114.    As a direct and proximate result of the fraudulent conduct of Defendants, as alleged above, Plaintiff suffered damages in the nature and amounts set forth in Paragraphs 7, 8, 10, 20, 47-54 and 64-77, above.

115.    The aforementioned conduct of Defendants was oppressive, fraudulent, malicious, and willful, and was intended to cause injury to Plaintiff. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages to deter such conduct in the future.

### FIFTH CAUSE OF ACTION

**Conversion**

**By All Defendants**

**On Behalf of Plaintiff and Class Members**

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

116.    At all times material hereto, Plaintiff was, and still is, the owner entitled to possession of SGB and FLR distributed to Defendants for the benefit of Plaintiff.

117.    Defendants converted Plaintiff's funds my misappropriating SGB and FLR and using them for Defendants' benefit.

118.    As a direct and proximate result of the conduct of Defendants, as alleged above, Plaintiff suffered damages in the nature and amounts set forth in Paragraphs 7, 8, 10, 20, 47-54 and 64-72, above.

119.    The aforementioned conduct of Defendants was oppressive, fraudulent, malicious, and willful, and was intended to cause injury to Plaintiff. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages to deter such conduct in the future.

### SIXTH CAUSE OF ACTION

**Common Count – Money Had And Received**

**By All Defendants**

**On Behalf of Plaintiff and Class Members**

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

120.    Defendants became indebted to Plaintiff for his SGB and FLR had and received by Defendants that was meant for the use and benefit of Plaintiff in the nature and amounts set forth in

Complaint                                          18

Paragraphs 7, 8, 10, 20, 47-54 and 64-72, above.

121.    No part of this amount has been paid, and there is now due, owing and unpaid from Defendants to Plaintiff the amounts wrongfully retained with interest.

## SEVENTH CAUSE OF ACTION

### Negligence

### By All Defendants

### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

122.    Defendants owed a duty of reasonable care to Plaintiff to hold in trust, custody and manage Plaintiff's SGB and FLR and ultimately transfer possession to Plaintiffs.

123.    Defendants materially breached this duty by mismanaging and misappropriating Plaintiff's SGB and FLR.

124.    As a direct and proximate result of the conduct of Defendants, as alleged above, Plaintiff suffered damages in the nature and amounts set forth in Paragraphs 7, 8, 10, 20, 47-54, and 64-72, above.

125.    The aforementioned conduct of Defendants was oppressive, fraudulent, malicious, and willful, and was intended to cause injury to Plaintiff. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages to deter such conduct in the future.

## EIGHTH CAUSE OF ACTION

### Violation of Unfair Competition Law – Bus. & Prof. Code § 17200 et seq.

### By All Defendants

### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

126.    The Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

127.    The acts of Defendants alleged herein, including but not limited to the breaches of fiduciary duty, diversion of Plaintiff's SGB and FLR, negligent misrepresentation, and fraud constitute unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

128.    By reason of the foregoing acts, Defendants have caused, and continue to cause,

substantial and irreparable injury to Plaintiff.

129.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer harm in an amount to be proven at trial, and are entitled to an award of restitution and the imposition of a constructive trust against Defendants.

## NINTH CAUSE OF ACTION
### Request for Declaratory Relief
### By All Defendants
### On Behalf of Plaintiff and Class Members

Plaintiff hereby incorporates by this reference all the allegations contained in this Complaint as if the same were fully set forth herein.

130.    Plaintiff is a person interested who requests a declaration of his rights with respect to ownership of the SGB and FLR currently under control of Defendants.

131.    An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the SGB and FLR received by Defendants for distribution to Plaintiff is legally the property of Plaintiff. Plaintiff disputes Defendants' contention that Defendants are the sole arbiters of the ownership of SGB and FLR.

132.    Plaintiff desires a judicial determination of his rights and duties, and a declaration as to whether SGB and FLR should be immediately distributed to him from Defendants' custody and control.

133.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain their rights and duties with respect to ownership of the SGB and FLR under Defendants' custody and control. Further, as the value of SGB and FLR continue to depreciate, Plaintiff and Class members continue to incur damages from Defendants' tortious actions.

### PRAYER FOR RELIEF

134.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

- An order certifying this action and the Class requested herein as a class action, designating Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

- An order declaring that Defendants' actions, as set forth above, constitute violations of the laws set forth above and that Defendants are liable to Plaintiff and the Class, as described herein, from damages arising therefrom;

- An injunction enjoining Defendants from selling, transferring, or staking SGB and FLR without permission from Plaintiff and the Class (the legal owners of the SGB and FLR);

- An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

- A judgment awarding Plaintiff and the Class all appropriate damages in an amount to be determined at trial;

- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;

- A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;

- A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and

- Grant such other legal, equitable or further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.


Dated this 13th day of January, 2023.



**HODL LAW CALI, APC**

By:   _/s/ *Frederick A. Rispoli*_____
Frederick A. Rispoli
27762 Antonio Parkway
Suite L-1, No. 232
Tel: 213-292-5200
Filing@HodlLaw.org
*Attorney for Plaintiff Dallas Woody*